IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| AWANA CLUBS INTERNATIONAL, an Illinois not-for-profit corporation,<br><br>         Plaintiff,<br>   v.<br><br>NEWGISTICS, INC., a Delaware corporation, and<br>PITNEY BOWES INC., a Delaware corporation,<br><br>         Defendants. | Case No. _1:20-CV-1002_____<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Awana Clubs International ("Awana"), by and through its counsel, Bryan Cave Leighton Paisner LLP, files this Complaint against Newgistics, Inc. ("Newgistics") and Pitney Bowes Inc. ("Pitney"). (Newgistics and Pitney will be collectively referred to as "Defendants.")

### I.  INTRODUCTION

1.      This is an action for breach of contract and related claims brought by Awana against Defendants related to a Logistics Management Services Agreement entered into by Awana with Newgistics, a subsidiary or division of Pitney, under which Newgistics was to manage Awana's inventory, product shipments, and returns (the "Agreement").

### II.  PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Awana Clubs International is a not-for-profit corporation organized and existing under the laws of the State of Illinois, and has its principal place of business at 1 E. Bode Road, Streamwood, Illinois 60107.

3.      Defendant Newgistics, Inc. is a for-profit corporation organized and existing under the law of the State of Delaware, with its principal place of business in Austin, Texas. Newgistics can be served via its registered agent for service of process, C T Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, or at such other place as it may be found.

4.      Defendant Pitney Bowes Inc. is a for-profit corporation organized and existing under the law of the State of Delaware, with its principal place of business in Stamford, Connecticut.  Pitney can be served via its registered agent for service of process, C T Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136, or at such other place as it may be found.

5.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because it between citizens of different states and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Newgistics because Newgistics transacts significant business within the Western District of Texas (Newgistics' principal place of business is in this District); because Newgistics purposely availed itself of the privilege of conducting activities in this District when it negotiated and entered into the Agreement, transacted business with Awana from this District, provided services to Awana under the Agreement from this District, and breached the Agreement within this District; and because Newgistics is a party to the Agreement, under which it consented to the jurisdiction of this Court in this District.  (*See* Agreement ¶ 8.7.)

7.      This Court has personal jurisdiction over Pitney because Pitney's transacts significant business within the Western District of Texas; because it transacts business in this District though its subsidiary or division Newgistics, which is headquartered in this District;

2

because it undertook the performance of Newgistics' contractual obligations to Awana under the Agreement (and breached Newgistics' contractual obligations to Awana), which performance and nonperformance occurred in part in this District; and because it undertook the performance of Newgistics' contractual obligations to Awana under the Agreement, in which the parties consented to the jurisdiction of this Court in this District.  (*See* Agreement ¶ 8.7.)

8.      Venue is proper in the Western District of Texas because one of the Defendants, Newgistics, resides in this District; because a substantial part of the events or omissions giving rise to the claims occurred in this District; because Newgistics has its principal place of business in this District; and because, under the Agreement, the parties consented to venue in this District. (*See* Agreement ¶ 8.7.)

## III.  GENERAL ALLEGATIONS

### A.  Allegations Relating to the Parties and the Joint Liability of Newgistics and Pitney

9.      Awana is a world-wide nonprofit ministry focused on providing Christian evangelism and discipleship solutions for children.  It is a global leader in child and youth discipleship and equips local volunteers in churches around the world with Biblical evangelism and discipleship materials so that "today's children may become tomorrow's Christian leaders, in every aspect of society and culture."  Because of the nature of its ministry, operations, and international service platform, a significant portion of Awana's business operations is the distribution of its written materials throughout the U.S. and the world.

10.      Newgistics promotes itself as "[d]eliver[ing] best-in-class omni-channel commerce solutions on-time, on-budget, and with industry-leading client satisfaction."  (*See* https://newgistics.com/about/.)  It asserts that it "creates cutting-edge digital commerce, fulfillment, shipping, and returns solutions that build meaningful connections with consumers

602166545.5

and drive business growth for our client brands." (*See id*.)  Elsewhere, Newgistics has asserted

that it is "engaged in the business of delivering logistics management solutions to clients

throughout the country" and these "solutions include product fulfillment, delivery, and return

services with multiple delivery and return options to increase customer satisfaction and loyalty,

as well as making transportation, warehousing, and dispositioning services available to clients in

order to create operational efficiencies."

11.     Newgistics is a subsidiary of, or division of, Pitney.  Pitney publicly describes

Newgistics as "part of Pitney Bowes" (see, e.g.,

https://www.pitneybowes.com/us/ecommerce/newgistics-tools.html).

12.     With regard to the Agreement, both Pitney and Newgistics disregarded their

distinct corporate existences (if any) and were instead both involved in the execution,

performance, breach, and termination of the Agreement.  For example:

> a.     Gregg Zegras, Pitney's Chief Revenue Officer (at the time), signed the Agreement;
> b.     At least 12 employees of Pitney communicated with Awana related to the Agreement;
> c.     Newgistics employees referred Awana to Pitney employees for various matters related to the Agreement;
> d.     Nearly every email signature block for the Newgistics and Pitney employees who communicated with Awana referenced Pitney, and not Newgistics;
> e.     Employees from both Newgistics and Pitney were regularly involved in various aspects of performing the Agreement and breaching the Agreement;
> f.     Gregg Zegras, Pitney's Chief Commercial Officer (at the time), signed the letter terminating the Agreement, which letter was on Pitney letterhead;
> g.     After termination of the Agreement, Cliff Rucker, Pitney's Senior Vice President of Client and Partner Success, sent a letter to Awana summarizing various post-termination issues, which letter was on Pitney letterhead.

13.     Newgistics and Pitney did not observe appropriate corporate formalities and

distinctions, Pitney undertook to perform various obligations under the Agreement, Pitney

4

voluntarily took an active role in the Agreement (including the breaches of the Agreement alleged in this Complaint), and Newgistics' and Pitney's operations and management overlapped in a variety of ways regarding the Agreement.

14.     Upon information and belief, Pitney also directed the actions of Newgistics, including through the actions of and directions issued by Pitney's officers and managerial agents, thereby rendering Pitney responsible for the actions and breaches of Newgistics.

15.     By virtue of the facts alleged in the previous paragraphs, both Newgistics and Pitney are liable in full for the breaches, claims, and damages alleged in this Complaint on one or more legal theories, including direct liability, vicarious liability, integrated enterprise, joint venture, conspiracy, joint tortfeasor, alter ego, or a pierce-the-corporate-veil theory.  (For ease of reference and to avoid constant references to both Newgistics and Pitney, for the remainder of this Complaint Awana will use "Defendants" to refer collectively to both Newgistics and Pitney.)

### B.  The Parties Enter into the Agreement

16.     In November 2017, Awana and Newgistics began discussions regarding moving all of its inventory management, fulfillment, and returns needs to Newgistics for management.

17.     In January 2018, Newgistics toured Awana's distribution center and had discussions about Awana's needs and Newgistics' ability to serve those needs.

18.     On February 1, 2018, John Sheahan ("Sheahan"), Emerging e-Commerce Sales Executive for Newgistics and later Pitney, sent a lengthy email to Kevin White ("White"), Awana's Vice President of Partner Relationships at the time, who later became Awana's Chief Operating Officer, promoting Newgistics' capabilities to handle Awana's needs.

19.     In his February 1, 2018 email, Sheahan stated, among other things, that:

[W]e are close to having a fully automated center located just outside of Indianapolis [i.e., Greenwood, Indiana].  This facility will be fully robotic, and will provide flawless accuracy for order processing. . . . [I]t is very impressive!

To highlight just a few items that we shared with you yesterday, which truly is the tip of the iceberg of our services;

  •   Face to face quarterly team meetings . . .

. . . .

  •   Kitting/packing to meet your exact specifications, as though you are standing with us packing your orders

  •   Inventory management controls, which will allow Awana to view orders as they are being processed in real time, and inventory counts the moment the item is pulled

. . . .  •   Same day processing and shipping for all domestic and international orders

. . . .

20.     In March 2018, Awana toured Newgistics facility in Hebron, Kentucky, and the parties exchanged additional communications about Newgistics assuming responsibility for all of Awana's logistics needs.

21.     In June 2018, Niel Randall ("Randall"), Director of Fulfillment Sales at Pitney, sent a PowerPoint deck to White entitled "Newgistics Network and AutoStore Slides" touting Defendants' "SuperCenter" and "AutoStore" capabilities with which Defendants would serve Awana's needs.

22.     Defendants promoted AutoStore as a cube-based, automated storage system that brings items in inventory to the employees instead of having employees walk through warehouse aisles to "pick" them, greatly increasing efficiency and accuracy.

23.     Defendants described their "Fulfillment AutoStore Automation Solution" as providing:

Optimized footprint for warehouse utilization
High efficiency: natural slotting, with best-in-class goods to person technology
Inventory security and accuracy
Customizable and flexible
Scales with clients experiencing exponential growth

6

Differentiator in the 3PL marketplace
No single point of failure

24.     On September 10, 2018, Sheahan sent another lengthy email to White (and others

at Awana) making specific commitments regarding what services, and the quality of the services,

Newgistics and Pitney could and would perform for Awana.

25.     Sheahan's September 10, 2018 email stated in part:

[H]ere are few highlights that Pitney Bowes will assist you with regarding your
fulfillment and transportation.
        ☐  We have the experience and proven track record for scaling fast
growing brands (20 per day to 75K per day, we have done it and done it well)
because of SuperCenter architecture (all under one roof)
        ☐  Seamless hand-off from Fulfillment to Transportation, reduces pick up
/ line haul and additional hand-offs
        ☐  Network footprint coupled with USPS partnership and an organically
built carrier partnerships enabling a faster & cheaper parcel delivery capabilities (
1 & 2 day, 3 day, 5 day, standard ground, cross border…etc)
        ☐  Dedicated Account Management that is on site and on the floor (so you
have tactical representation on-site)
        ☐  Executive Dashboards and WMS tools are accessible and efficient
(web based)
        ☐  Powerful API's to allow breadth of integration without sacrificing data
or latency.
        ☐  Dedicated team to ensure Total Consumer Experience and refine out of
the box experiences with customized options for pack-outs, kit to stock, and
branded boxing
        ☐  Integrated Enhanced Tracking Solution that extends your brand, creates
upsell / cross sell opportunities and reaches across the fulfillment, delivery and
returns experiences providing rich data back to you iterate and improve
campaigns
        . . . .

26.     To further induce Awana to enter into the Agreement, Defendants represented to

Awana that they were industry leaders in logistics management solutions.  For example, they

promised logistics "solutions" that included "goods fulfillment delivery and return services with

multiple delivery and return options to increase customer satisfaction and loyalty as well as

7

making transportation, warehousing, and dispositioning services available to its clients in order to create operational efficiencies."

27.     Based on Defendants' representations, Awana entered into the Agreement.

28.     On October 2, 2018, Awana signed the Agreement.

29.     On October 3, 2018, the Agreement was countersigned for Defendants by Gregg Zegras ("Zegras"), who was at the time the "CRO" (Chief Revenue Officer) of Pitney (not Newgistics).

30.     From November 2018 to February 2019, Awana invested significant time and money in transitioning its inventory and shipping operations to Defendants.

### C.  The Performance Requirements of the Agreement

31.     The Agreement required Defendants to provide a high level of service to Awana. For example, the Agreement required Defendants to maintain at least a 99.0% or 99.5% performance level in six specifically identified categories of services:

> Order Fulfillment Accuracy (99.0%)
> On-Time Shipping (99.0%)
> Receiving Timeliness (99.0%)
> Inventory Accuracy (99.0%)
> Returns Processing (99.0%)
> System Uptime (99.5%)

(*See* Agreement, Exhibit D, pp. 21-25.)

32.     Given that the parties' agreed tolerance for error was less than one percent (by identifying the performance standards as 99.0% or above), performance even at a 98.0% level meant that Defendants were creating double the errors that Awana could tolerate.  Unfortunately, Defendants' performance was dramatically worse than a 99.0% level, as recited in detail below.

### D.  Defendants' Substantially Deficient Performance Under the Agreement

8

602166545.5

33.     After weeks of planning, February 4, 2019, was the "go live" date on which Defendants were to have all of Awana's products properly inventoried and were to begin timely shipping of products for Awana.

34.     Just days later, on February 7, 2019, White sent an email to Tom Behnke ("Behnke"), Vice President and General Manager of Fulfillment, and Jay Coile ("Coile"), Director of Account Management for Pitney, that attached a six-page letter documenting, with photos, the numerous problems Awana had already experienced with Defendants' performance.

35.     In his February 7, 2019 email, White described Defendants' terrible initial performance up to that point as "death by a thousand paper cuts."

36.     On February 8, 2019, Coile responded by email, acknowledging Defendants' poor performance (emphasis added):

> First, thank you for your business and partnership. We are excited to have you on board and we are looking forward to a successful 2019 with Awana. *I know there have been some initial challenges and that definitely is frustrating. I want to assure you that we are committed to this partnership and we will do what we need to in order to resolve these opens* [sic] *issues*. Looking forward to discussing more during our call at Noon.

37.     During a phone call between White and Coile that same day (February 8, 2019), Coile (1) admitted that Defendants' performance during the initial several weeks was terrible, (2) committed to providing a written corrective action plan by the end of the day, (3) said they were now going to bring in their "brightest" employees from the Hebron, Kentucky facility to do the layout work that should have happened prior to Awana's launch, (4) acknowledged that Defendants needed better employees and better supervision at the Greenwood, Indiana facility (which managed Awana's inventory and shipping), and (5) said they were going to hire a new

602166545.5

Director of Operations for all their Midwest fulfillment centers, who would also be based in Greenwood, which he said would solve Defendants' performance problems on Awana's account.

38.     During the period of February 2019 through June 2019, Defendants' performance under the Agreement fell well short of the standards required by the Agreement.  (See, for example, Exhibit A, which is discussed below.)

39.     During the period of February 2019 through June 2019, Awana made repeated efforts to secure Defendants' compliance with the Agreement, including by contacting, or attempting to contact, Defendants' personnel by phone and email.  Defendants were mostly unresponsive and never brought their performance up to the requirements of the Agreement.

40.     On June 27, 2019, White sent an email to Behnke expressing his serious concern over Defendants' repeated and significant failures to perform as required under the Agreement.

41.      On June 28, 2019, Behnke responded by email and admitted, "I think my voicemail box was full earlier this week – terrible maintenance on my part."  Behnke assured White that Defendants would "make sure [they were] ready for [Awana's] busy season," that there had "[b]een a lot of good expansion with that team [assigned to Awana] as well as training as the building begins to fill up appropriately," and that Defendants were supposedly "[r]unning a second shift now with full Inventory Control support as well."

42.     On July 15, 2019, White sent an email expressly significant concern that Defendants were not prepared to handle Awana's peak distribution season and requesting a call to discuss the matter with Behnke; Anthony Vicars ("Vicars"), Operations Manager with Pitney; and Caleb Bedgood ("Bedgood"), Senior Account Manager with Pitney.

43.     When a call had still not been set up 14 days later, White sent another email on August 1, 2019, pleading for a conference call on August 5, 2019.

602166545.5

44.     In phone calls Awana had with Defendants' personnel on August 5, 7, and 9, 2019, Defendants promised many changes to bring Defendants' performance within the standards of the Agreement.  Unfortunately, these commitments were never fulfilled.

45.     On August 9, 2019, White sent an urgent text message to Behnke about Defendants' lack of follow through on certain commitments made.  Behnke did not respond, nor did anyone else from Defendants contact White.

46.     On August 15, 2019, White sent the following email to Behnke, conveying the extraordinarily negative impact that Defendants' terrible performance under the Agreement was having on Awana's business and staff:

> Is there anything you can to do help be an encouragement to our customer care team? Words of wisdom, perspective, encouragement, some sort of confidence? I'm at a bit of a loss of how to help them manage through this debacle.
> I just finished meeting with my Customer Care Director and her team is struggling with the barrage of calls from customers. One of our reps threw up yesterday from the anxiety, two have gone home from migraines.
> Our care team had a bit of a therapy session today to vent the phrases they hear that are hurting the most...
> •       "You are not managed well."
> •       "This is ridiculous."
> •       "Why can't I get an ETA on my package ship date?"
> •       "This is not the distribution center's fault; this is Awana's fault for not preparing them correctly."
> •       "This is stupid."
> I hear the work being done, but the fact that we're in the hole we are in means we're bracing for another 4-6 weeks of this kind of intensity.
> Just looking to figure out a way to manage through the mess......
> Kevin White

47.     Shortly thereafter, Behnke visited the Greenwood, Indiana facility out of which Defendants were managing Awana's inventory and fulfillment needs, and Behnke admitted that Defendants' performance was poor, admitted that "this is not a good situation," admitted that Defendants needed a "revamp [of the] staffing plan and the leadership team," said that

11

Defendants were bringing in a Senior Operations Manager to "help us get back on track," and promised that they would be able to "recover."  Behnke's email stated:

> Hi Kevin,
>       I was in Greenwood yesterday and am better informed about our current situation with Awana and the building operations in general.
> Obviously this is not a good situation… Anthony and I have worked with the Engineering Team and the Operations Team to revamp the staffing plan and the leadership team as we're scaling the business…
>       Caleb has just received that update staffing plan and productivity plan for Awana and will be sharing it later today/tomorrow.  We've brought in a Senior Ops Manager from CVG for the weekend to help us get back on track.
>       I'd like to offer my support to Sharon to help message some of those comments you listed … these are challenging issues and we need to help people deal with your customers.   If that helps, or makes sense please let me know.
>       I'm in Austin, TX today for our monthly management meetings and these circumstances for Awana are on the agenda.
> We will recover.
> Thanks
> Tom

48.      On August 21, 2019, Behnke admitted to White by phone and text message that Defendants were not performing up to the required standards and again promised that significant changes would be made to address Defendants' poor performance.

49.      On August 21, 2019, at 5:45 p.m., White sent a lengthy email to Behnke and Bedgood recapping many of the problems and the needed solutions.

50.      Hours later White saw Defendants' shipment figures for that day, and they were worse than ever.  So White immediately (on August 21, 2019, at 9:27 p.m.) sent an email marked "urgent" to several of Defendants' personnel (Behnke, Bedgood, Vicars, Coile, Sandrine Singel, and Mas Cramer), asking for immediate attention to the matters (emphasis added):

> pb Team,
>       *Please tell me this is a joke and there is a system error. Today is even worse than the last two days. This is absolutely ridiculous. Is anyone even paying attention to these numbers and performance?*
>       *I'm at a loss.*

12

I've appealed to you all practically, with reason, explaining how vital this is to us and the work we do.

Where do we go from here? *All the promises of the last two weeks are going nowhere. We are regressing, not progressing.*

8/21 - 172 orders, 9308 pieces

I am available between 9am and 10am Central for a call tomorrow (Thursday).

51.     Later that night (August 21, 2019, at 10:57 p.m.), White sent another email marked "urgent" to others in leadership at Defendants (Sheahan; Richard Makaras ["Makaras"], Senior Manager of Client Solutions at Pitney; and Niel Randall, Director of Fulfillment Sales at Pitney) (emphasis added):

We have 5000 orders in the queue. Less than 200 moved out today. *Rolling orders in the WEEKS now, not even days.*

*This is our peak season, we are losing customers over this. It's become a crisis for us.*

This is the product you guys sold us. Thought you should know.

52.     As just one example of Defendants' dramatic underperformance, the Agreement required *same-day* shipping of orders received by the established cut-off time for the day and next-business-day shipping for orders received after that day's shipping cut-off.  (*See* Agreement, Exhibit D, p. 22.)

53.     But as noted in White's August 21, 2019 email, Defendants sent out only 200 packages, when there were 5000 orders in the queue.

54.     At a rate of 200 packages a day, it would take 25 days to send out the 5,000 orders in the queue, and in the meantime, if only 500 orders came in per day, shipping would only fall further behind, and thousands of Awana's customers might not receive their ordered materials for literally months.

55.     By email dated August 22, 2019, Makaras admitted to White the significant problems in Defendants' performance under the Agreement (ellipses in original):

Good Morning Kevin –

I'm sincerely heartbroken reading the below and the issues you're having with our team filling your orders in a timely manner … I simply don't know what to say … or how I can help.

I was under the impression that we were having difficulty, but your team along with ours were working through it jointly, successfully.

Outside of the obvious, what looks like going to Greenwood and shipping orders, is there anything I can do to help?

Rich

56.     On August 22, 2019, White spoke with certain of Defendants' personnel and they made various commitments to immediately address the dramatic and growing deficiencies in their performance under the Agreement.  White confirmed the plan to the Defendants' personnel by email that day at 3:12 p.m.

57.     Unfortunately, Defendants' performance and communication deficiencies continued.  So on August 27, 2019, White sent an urgent text message to Defendants' personnel:

End of the day. I need an update please. Yesterday was the best performance in a long time (well done Caleb).  Do we have a plan to ramp up to 600-700 orders a day? 8 days left to hit the backlog clearance target.

58.     On August 28, 2019, White sent another email to Defendants' personnel (Bedgood, Coile, Vicars, and Behnke) expressing that Defendants' ongoing breaches of the Agreement were continuing to create a crisis for Awana's organization because they were losing long-time, high-value customers because of Defendants' terrible performance (emphasis added):

. . . I CANNOT stress enough how critical the extra horsepower is to hit the necessary targets. It seems to me efficiencies is one thing. Manpower is another. *This has become a crisis for our organization. We are losing long-time high value customers over our inability to deliver in a reasonable fashion.*

Let's talk again today.

59.     On August 29, 2019 at 9:58 a.m., White sent an urgent text message to Defendants' personnel (Bedgood, Coile, Vicars, and Behnke):

14

Gentlemen, I was promised a plan by EOD [i.e., end of day] yesterday. Haven't seen it.
Looks like only 318 orders with 11K pieces processed yesterday.
Can i get this update and progress plan ASAP?
I am out this morning while my youngest daughter has a surgical procedure. Will check in again later.
Thank you.

60.     It was not until over nine hours later (August 29, 2019 at 7:32 p.m.) that anyone responded to White's text message.  When he did respond, Behnke acknowledged the "pain" that Defendants' underperformance was causing Awana and admitted that Defendants needed to assign more staff to Awana's account:

Hi Kevin
Just landed back in Denver. Hear the pain in your message. Pushing for some inventory replenish support to help move orders more effectively... Jay and Caleb will help report
Let's talk in the morning
Tom

61.     As of August 29, 2019, 89% of the orders Defendants were shipping were going out 72 or more hours after the orders had been received, when the Agreement required Defendants to ship orders either the same day (if the order was received by the agreed same-day shipment deadline) or the next business day (if received after the deadline).

62.     On August 30, 2019, White sent an email to Vicars (who was based at Pitney's Hebron, Kentucky facility) to follow up on a telephone call White and Vicars had had that morning.  (White was told that Vicars was brought in to address the major problems with Defendants' performance on Awana's account.)  White's email stated (emphasis added; ellipsis in original):

Anthony,
A quick followup on our call this morning.
Our internal analysis shows at current average pace, 21 days to clear current backlog ... also meaning, then, that all September orders won't start

15

shipping until 9/20 (and without major changes, *the current throughput based on our September forecasts will continue to roll a 20-30 day turnaround time*).

I continue to sound like a broken record, but *this simply will not work for us*. It is imperative that we shrink this considerably, whatever it takes to make that happen.

My expectation remains:

~Current backlog caught up in the next week (which is a modification from what we originally communicated about last week).

~Orders placed according to the following schedule ship as such:

- September 3 (ship by September 8)
- September 4 (ship by September 9)
- September 5 (Ship by September 10)
- And so on.

It's not ideal and still out of SLA, but I can tolerate a 3-5 day turnaround for large orders in this season. But anything greater than that simply does not work.

*I'll reiterate it once again -- we are losing customers and spending in the tens of thousands of dollars on customer credits and expedited freight* (not including soft costs of personnel that has been reallocated and burdened because of this). Awana has had its fair share of distribution-related crises in the past, but *this has gotten to an all-time high*.

Looking forward to the call with outlined resolution this afternoon.

Kevin White

63.     As stated in White's August 30, 2019 email, Defendants' poor performance under the Agreement was causing Awana to lose customers, was causing Awana to spend in the tens of thousands of dollars on customer credits and expedited freight, was creating a huge burden on Awana's internal staff, and was the worst distribution-related crisis Awana had ever experienced.

64.     Also on or about August 30, 2019, Awana asked that Defendants cover the cost of next-day delivery or second-day delivery on the shipments that Defendants were not timely shipping as required by the Agreement.

65.     On September 3, 2019, White spoke with Behnke by phone.  Behnke said that Defendants would not cover the cost of providing next-day delivery or second-day delivery on shipments on which Defendants were behind schedule because it would cost Defendants about $1,000,000.  (This again illustrated how far behind Defendants were on timely shipping Awana's

602166545.5

products.)  Behnke admitted that Defendants' substantial underperformance was a result of Defendants' growth that occurred too quickly and that was not managed adequately by Defendants.  Behnke said that Defendants were working on a plan to accelerate shipping times, but would make not commitment as to what Defendants would be able to do or by when.

66.     As of September 2, 2019, 54% of the orders that Defendants were shipping were going out 72 or more hours after the orders had been received.

67.      In early September 2019, Marshall Makaila ("Makaila"), an operations specialist with Pitney who was based in Austin, Texas, was brought in to lead the "cleaning up" of Defendants' poor performance on Awana's account.

68.     On September 5, 2019, White sent an email to Makaila, Behnke, and Nick Pellegrino ("Pellegrino"), Executive Vice President and General Manager of Fulfillment and Parcel Services (with a copy to other of Defendants' personnel), offering continued assistance in getting Defendants' performance back on track and expressing the urgency of the matter.

69.     On September 6, 2019, White had a phone call with Pellegrino and Behnke.  They agreed that Behnke would provide by September 9, 2019, (1) an itemization of the credits that Defendants would provide to Awana because of Defendants' Agreement-breaching poor performance in August 2019 and (2) information regarding the additional credits Defendants would provide to Awana for September 2019.

70.     Defendants did not provide the information promised on September 6 relating to credits that Defendants would provide to Awana.

71.     On September 10, 2019, White sent a follow-up email to Behnke and Pellegrino:

> Following up from our call last week. As I recall, yesterday we were to have numbers related directly to credit for SLA failure on ship time for August and some preliminary estimates on September. Then tomorrow we would further

17

our dialogue on other compensation. I am working with our team to get the full picture of our direct costs to date as well as other non-compliance on SLA related to order accuracy.

Please advise if I am mistaken on this understanding of a plan.

. . . .

72.     On September 12, Behnke sent White an email saying that Defendants were still investigating what financial credits Defendants were willing to offer to Awana, but admitted that for the month of August 2019, Defendants failed to ship at least 4,835 orders within the time frame required by the Agreement.

73.     On September 20, at a meeting held on-site at Defendants' facility in Greenwood, Indiana where Awana's inventory was managed, Awana learned that both Behnke and Pellegrino were leaving the company.  Awana was told that Mohammad Adwah, a Senior Operations Manager who had only been with the company a week or two, would be assigned to Awana's account.  During this meeting, Defendants' personnel admitted that Defendants' facility did not have enough horizontal space to manage Awana's inventory properly, that the optimization plan developed in February 2019 was never put into place, and that the facility would never have conveyers (which would make the operations much more efficient).

74.     On September 24, 2019, White spoke to Zegras (Pitney's Chief Revenue Officer) by phone.  During that conversation, Zegras (1) admitted Defendants' unacceptable performance saying, "This has not been our finest hour, week, month, or quarter. That's not okay."; (2) admitted that Defendants had been doing "crisis management" for the prior two weeks and that they should have escalated internally the attempts to resolve the problems much sooner; (3) admitted that certain personnel were being let go related to Defendants' poor performance; (4) said that Defendants were going to bring in a new and stronger "Client Success Manager" to address the problems; (5) said that other staffing changes were also going to be made to try to

18

address the problems in Defendants' performance; (6) admitted that some of the problems in Defendants' performance related to the integration of Newgistics with Pitney, and (7) admitted that things had been a "disaster" in part because Defendants' business grew too quickly.

75.     Zegras also told White that David Kruyer, the facility director at the Greenwood facility, had been separated from the company, further impacting Awana's account.

76.     On September 25, 2019, and as a result of discussions between Awana and Defendants and internal discussions at Defendants, Defendants approved Awana's delivery of the following apology letter to Awana's customers, which numbered over 5,000:

> Dear Awana Customers and Partners,
> On behalf of Pitney Bowes and our partner Awana, I want to apologize for the delays you have experienced with your orders and assure you we are fixing the problems to get them processed as quickly as possible. Our team has been working diligently with the team at Awana for the last couple of months and we currently expect to have all orders cleared by October 11th and resume a standard shipping turnaround time going forward.
> Please know, these delays were caused by circumstances not within Awana's control.
> At Pitney Bowes, our priority is client satisfaction and we are committed to providing the highest levels of service for our clients and their customers. We recognize that these delays have not met that standard and we are working to deliver all orders as quickly as possible.
> Sincerely,
> Gregg Zegras
> Chief Commercial Officer, Commerce Services
> Pitney Bowes

77.     On September 27, 2019, Sharon Sifnotis ("Sifnotis"), Awana's Director of Supply Chain & Logistics, sent an email with a lengthy attachment to the persons who Defendants said would be the new team managing the work for Awana:  Marshall Makaila (identified above); Darin Smith ("Smith"), a person Defendants described as a "success manager"; and George Trantas ("Trantas"), Vice President of Client Success for Pitney.  The email attachment detailed

602166545.5

numerous "open issues" with Defendants' performance under the Agreement, and even included photos.

78.     When no one from Defendants responded substantively to Sifnotis's September 27, 2019 email, White sent a follow-up email on October 3, 2019 to Smith, Makaila, and Trantas:

> Can you let us know next steps in our conversation here?  Even if it takes more time to review, would be good to hear what you're thinking and planning as far as our next steps.

79.     Smith acknowledged receipt of White's email on October 3, 2019, writing: "Currently still working with the team on these items but will connect with you next week for some follow up.  Thanks, Darin."

80.     No one from Defendants ever provided a substantive response to the September 27, 2019 email.

81.     As of October 15, 2019, 25% of Defendants' shipments were going out 72 or more hours after the orders had been received, in breach of the Agreement.

82.     In October, November, and December 2019, Defendants continued their unresponsiveness and neglect of Awana's needs, and Defendants' breach of the Agreement continued.

83.     For example, from December 1, 2019, to December 19, 2019, Defendants were roughly seven days behind in shipping Awana's products.

*E.  Defendants' Termination of the Agreement and Their Continued Failure to Perform under the Contract*

84.     Without prior notice, Awana was asked to join a conference call on January 21, 2020, hosted by Coile, Smith, and Bedgood.

20

85.     On the January 21, 2020 call, Coile communicated that Defendants were giving the minimum required notice (90 days) that it was terminating the Agreement.

86.     Defendants also sent an email attaching a letter on Pitney letterhead stating:

[Pitney Bowes letterhead]
Awana Clubs International
1 E. Bode Road
Streamwood, IL 60107

Re: Termination of Logistics Management Services Agreement

This notice of termination is being delivered pursuant to Section 4.2 of the Logistics Management Services Agreement dated October 3, 2018. Service Provider hereby elects to terminate services effective April 20, 2020 ("Termination Date"). Prior to the Termination Date, we will work with you to bring your account current and transition your inventory out of the processing centers.

Regards,
gregg.zegras@pb.com
Gregg Zegras
Chief Commercial Officer

87.     In an email dated January 25, 2020 from Zegras to White, Zegras admitted, "We are simply not equipped to manage your business and need to act [i.e., to terminate the Agreement] before we hit another peak." But Zegras committed, "[W]e will do our best to find another provider that has the capability for your more b2b [i.e.., business-to-business] needs it [sic] that is what's required."

88.     Despite Zegras's commitment in his January 25, 2020 email, Defendants never did anything to assist with Awana in finding another provider that could meet Awana's logistics needs.

89.     In February 2020, Defendants assigned yet another new employee to Awana's account. This was Sam Coiro ("Coiro"), a "client success" employee of Pitney.

90.     Hoping to ensure that the remainder of the parties' relationship went better than the prior several months, and to discuss the timelines for exiting due to the significant workload and Defendants' inadequate personnel and leadership, Awana held an in-person meeting with Corio and Cliff Rucker ("Rucker"), Pitney's Senior Vice President for Client Success.

91.     Unfortunately, Coiro and Rucker were not prepared for the meeting, were unprofessional, and did not communicate any intention to engage in a productive partnership with Awana as the parties wound down their relation.

92.     In February 2020, Lila Snyder ("Snyder"), Pitney's Executive Vice President and President of Commerce Services got involved, but by email dated February 11, 2020, simply communicated that Defendants would not change the termination date for the Agreement, which had been re-set to April 27, 2020.

93.     In February 2020, Awana sought to make arrangements for Awana personnel to visit the Greenwood, Indiana facility in order to begin organizing, packing, and scheduling for return, all of Awana's inventory.  Awana estimated that the facility held about 35 truckloads of Awana inventory.

94.     Under the Agreement, Awana had the right to be given access to the facility to remove its inventory, and in no instance were Defendants permitted to charge Awana for packing up Awana's inventory unless Defendants provided an estimate of the fees requested in advance and Awana approved and prepaid those requested fees.  (*See* Agreement ¶ 4.4(c) ["Service Provider will either (i) [pack up inventory upon Client's "prepayment" of fees] or (ii) provide Client or Client's agent access to remove the Goods during a mutually agreed upon time"].)

95.     Defendants refused to permit Awana access to the Greenwood, Indiana facility and refused to permit Awana to participate in the return-of-inventory process.

96.     Shockingly, after refusing to permit Awana to participate in the process of returning Awana's inventory, Defendants began invoicing Awana at the rate of $29 per hour for work that Defendants' employees allegedly performed related to the return of Awana's inventory.

97.     On February 25, 2020, Sifnotis sent an email to Bedgood and another newly assigned Pitney employee, Jorden Green ("Green"), Account Manager, regarding numerous wind-down matters.

98.     In her February 25, 2020 email, Sifnotis, among other things, complained to Defendants about the improper labor charges for which Defendants were billing Awana.  She wrote, "Labor: I am noticing that labor ($29/hr) and barcoding costs are going up on recent invoices. Is Pitney charging us to move? It seems unethical to not allow us to do any labor to move ourselves and then charge us labor for moving activities."

99.     Defendants never addressed Awana's complaint, and continued to assess labor charges related to the return of Awana's inventory.

100.    Another issue Sifnotis sought to confirm in her February 25, 2020 email was that Awana would have adequate time after the termination of the Agreement on April 27, 2020, to continue to access the Warehouse Management System ("WMS") (the computerized inventory management system), including so that it could pull data to audit and close Awana's books.

101.    In a phone call on February 26, 2020, Bedgood promised that the WMS would remain open for 30 days after the termination date (so until May 27, 2020).

102.    On February 28, 2020, Defendants sent an email attaching a second letter terminating the Agreement, which confirmed the April 27, 2020 termination date, and which was also on Pitney letterhead:

23

[Pitney Bowes letterhead]
February 28, 2020
Awana Clubs International
1 E. Bode Road
Streamwood, IL 60107

Re: Termination of Logistics Management Services Agreement

This notice of termination is being delivered pursuant to Section 4.2 of the Logistics Management Services Agreement dated October 3, 2018. Service Provider hereby elects to terminate services effective April 27, 2020 ("Termination Date").  Prior to the Termination Date, we will work with you to bring your account current and transition your inventory out of the processing centers.

Regards,
gregg.zegras@pb.com
Gregg Zegras
Chief Commercial Officer

103.    On or about March 4, 2020, Bedgood was separated from employment.  In his place, Defendants assigned new employee Jorden Green to be Awana's Account Manager.

104.    Just three weeks later (on or about March 26, 2020), Green was deployed to active duty with the National Guard and thereafter performed no work on Awana's account.

105.    Also, in early 2020, George Trantas, Vice President of Client Success for Pitney, with whom Awana had communicated regarding various issues, left Pitney.

106.    On April 27, 2020, the Agreement was terminated pursuant to the prior notice Defendants had given.

### F.  Defendants' Post-Termination Breaches and Other Improper Conduct

107.    Defendants should have provided their final invoice to Awana on or about May 4, 2020, but Awana did not receive it until May 21, and only after making three separate requests for it.

24

602166545.5

108.     By email dated May 18, 2020, Rucker blamed the delay in sending the final

invoice on the departure of yet another Pitney employee on the team assigned to Awana, Jay

Coile, and "legal review."

109.     On May 21, 2020, Defendants issued their final invoice in letter form.  The letter,

sent by Pitney employee Cliff Rucker stated in relevant part:

> May 21, 2020
> VIA EMAIL
> Kevin White
> Awana Clubs International
> 1 E. Bode Road
> Streamwood, IL 60107
> kevinw@awana.org
>
> Re: Outstanding Inventory and Payment Matters Relating to Logistics
> Management Services Agreement between Newgistics, Inc., a Pitney Bowes
> Company ("Newgistics" or "we"), and Awana Clubs International ("Awana"),
> dated October 3, 2018 (as amended, the "Agreement")
>
> Mr. White:
>          . . . .
>          As indicated by the Accounts Receivable Aging Table reproduced in
> Schedule 7 to this letter, Awana currently owes Newgistics a total of $33,549.74
> ("Outstanding Invoice Balance") for fulfillment services rendered under the
> Agreement. Additionally, Newgistics expended 912 hours of labor in connection
> with preparing and removing Awana's inventory for its return to Awana. Pursuant
> to Section 4.4 of the Agreement, Awana owes Newgistics $27,241.44 (912 hours
> at $29.87, the Special Projects rate effective December 29, 2019) for such
> services (together with the Outstanding Invoice Balance, the "Outstanding
> Balance").
>          Newgistics will retain the entirety of Awana's $25,000.00 security deposit
> provided to Newgistics in connection with the Agreement, and credit such amount
> towards the Outstanding Balance. We request Awana pay the remainder of the
> Outstanding Balance, equal to $35,791.18 ("Remaining Balance"), to Newgistics
> within 14 days following receipt of this letter.
> Regards,
> Newgistics
> cliff.rucker@pb.com
> Cliff Rucker
> SVP, Client and Partner Success

602166545.5

110.    When Awana requested more detail regarding Defendants' billing for 912 hours (and $27,241.44) for "labor in connection with preparing and removing Awana's inventory for its return to Awana" (for example, labor on what dates?  by whom?  doing what specifically?), Defendants responded in a May 22 email that attached an invoice that provided no additional detail and stated only "Description[:]  912 labor hours @ $29.87[.]  Total[:] $27,241.44."

111.    During the period of the Agreement, Defendants issued weekly electronic invoices to Awana by email.

112.    On the same date that each of Defendants' invoices were issued, Defendants initiated an ACH (automated clearing house) electronic withdrawal from Awana's bank account to pay Defendants' assessed charges.  The only exception to this is that Defendants did not pull ACH withdrawals for its invoices on April 18, 2020, April 25, 2020, or May 21, 2020; Awana paid those charges by check (except as noted in the next paragraph).

113.    On June 12, 2020, Awana made its final payment to Defendants, in the amount of $8,549.74.  Awana declined to pay the improper $27,241.44 labor charge referenced above, and Defendants have not sought payment of the $27,241.44.

114.    Over the life of the Agreement, Awana paid Defendants a total of $2,655,144.29. This was in payments beginning on or about January 12, 2019, and ending June 12, 2020.

115.    By agreement of the parties on February 26, 2020, Awana was to have access to the WMS for at least 30 days following termination of the Agreement, i.e., until at least May 27, 2020.

116.    In breach of the parties' agreement, Defendants cut off Awana's access to the WMS on May 19, 2020.

117.    In mid-May 2020 (after all inventory was to have been shipped back to Awana), Defendants located more of Awana's inventory in their warehouse, which required Awana to bear the additional expense of another truck to retrieve Awana's property.

118.    In May and June 2020, when Awana reviewed the inventory that Defendants had returned to Awana, Awana found numerous problems.  For example, it found (1) product that had been damaged (including through improper inventory storage and improper packing of items for their return to Awana); (2) product that had been labelled over, making the items unsaleable; (3) product that had been mixed in with nonmatching items, making their location untraceable in the inventory system and creating significant additional work in sorting and re-inventorying product that should already have been properly segregated; and (4) product that was entirely missing.

119.    As yet another confirmation of Defendants' widespread failures to perform under the Agreement, at least one former employee of Defendants contacted Awana to communicate that he felt badly about how poorly Defendants served Awana.  In his words, "I waved the red flag, gave [Defendants] a path to fix what was broken. Unfortunately, they made a lot of bad decisions with investments, and no one wants to admit it was a mistake. So, they stay the course. The Greenwood building was destined for failure before it even opened."

### G.  Awana Gave Notice of Defendants' Breaches and Sought Compensation, But Matters Were Not Resolved

120.    On May 27, 2020, legal counsel for Awana sent by email an 11-page, single-spaced letter to Defendants, which outlined Defendants' significant breaches of the Agreement, outlined the financial losses and damages that Awana had suffered, and requested compensation therefor.

602166545.5

121.    On August 31, 2020, legal counsel for Awana sent by email another lengthy letter, this time to Defendants' outside legal counsel, which provided further explanation of, and evidence for, Defendants' significant breaches of the Agreement and the financial losses and damages that Awana had suffered.

122.    Because Awana and Defendants could not resolve matters between them, this lawsuit became necessary.

COUNT I
BREACH OF CONTRACT—SERVICE LEVEL AGREEMENT BREACHES

123.    Awana incorporates by reference each of the allegations in Paragraphs 1-122 above.

124.    The Agreement constitutes an enforceable contract.

125.    Awana fully performed its obligations under the Agreement.

126.    As stated, the Agreement required at least a 99.0% or 99.5% performance level in the six identified categories of enumerated services:

> Order Fulfillment Accuracy (99.0%)
> On-Time Shipping (99.0%)
> Receiving Timeliness (99.0%)
> Inventory Accuracy (99.0%)
> Returns Processing (99.0%)
> System Uptime (99.5%)

(*See* Agreement, Exhibit D, pp. 21-25.)

127.    A single month in which performance fell short of the stated performance requirement obligated Defendants to, "within one week" "implement a corrective action plan," and then "meet/exceed the Expected Performance Level for the following two fiscal months."

(*See* Agreement, Exhibit D, pp. 21-25.)

128.    If Defendants did not meet the Expected Performance Level in the following months, Defendants were required to issue monetary credits of various types.  (*See* Agreement, Exhibit D, pp. 21-25.)

129.    Unfortunately, Defendants' performance was so deficient it was difficult to even calculate how far off the mark Defendants' performance was.

130.    For example, Receiving Timeliness required Defendants to record certain initial data pertaining to each shipment received into the WMS "within 1 business day of arrival" and then the full data for the inventory received within "1-2 business days."  (*See* Agreement, Exhibit D, p. 23.)  Sometimes, though, inventory (even an entire trailer of inventory) would arrive at the Greenwood facility and Defendants would not properly record the inventory arrival date (or would not record an accurate inventory arrival date) and/or would not enter the new inventory into the WMS until days later.

131.    Because Defendants did not even acknowledge receipt of the shipments and record them as having been received on the day the trailer arrived, it appeared as if Defendants were not late (or were not as late as thought) in complying with their Receiving Timeliness duties.  In fact, however, Defendants had plainly breached their duty to enter the shipments' preliminary data into the WMS within one business day of arrival (thereby depriving Awana of timely knowledge of what deliveries had been received) and further breached their duty to have all individualized inventory data in the WMS within one to two business days (again depriving Awana of timely knowledge of exactly what inventory was on hand).

132.    Making matters worse, if Defendants were collecting the required data and computing how its performance was measuring up to the Agreement's standards, Defendants were not providing that reporting to Awana (which, as stated in the Agreement, was to be done

602166545.5

on a monthly basis).  Thus, while the fact that Defendants were dramatically underperforming was self-evident, computing Awana's damages (including the specific credits still owed to Awana for Defendants' month-after-month breaches) will likely require information and documents from Defendants.

133.    In any event, Awana has made a good faith determination, based on the information it has reasonably available (and spending only a reasonable amount of time on the matter given that it does not yet have information and documents from Defendants), of Defendants' performance in the six specified categories of service, on a monthly basis.  Attached as Exhibit A is a report that summarizes (and as best Awana can determine at this time) Defendants' performance.

134.    Defendants' performance was so bad, and so extensive, it was essentially a complete failure to perform.  (*See* Ex. A.)

135.    With respect to Order Fulfillment Accuracy, Defendants failed to meet the Agreement's standards in at least four months.  (*See* Ex. A.)

136.    With regard to On-Time Shipping, which required same-day shipping of orders received by the established cut-off time for the day and next business day shipping for orders received after that day's shipping cut-off (*see* Agreement, Exhibit D, p. 22), Defendants never met the required standard, never even came close to the required standard, and once performed at the 4% level when Defendants were required to perform at the 99% level.  (*See* Ex. A.)

137.    With respect to Receiving Timeliness, as stated, Defendants' failure to timely record trucks/trailers' arrival on the property (recording such arrival sometimes days later), makes it impossible for Awana to compute exactly how poor Defendants performance was in this category.

30

138.     But based on the information Awana has, Defendants' performance was no better than is indicated on Exhibit A, which shows that Defendants failed to meet the contractual standards in eight months, and their performance was at the 61%, 62%, and 72% level in three months—instead of the required 99.0% level.  (*See* Ex. A.)

139.     Regarding Inventory Accuracy, which required a complete annual physical inventory, Defendants never performed the required annual physical inventory.

140.     With respect to Returns Processing, Defendants' performance never complied with the Agreement.   Under the Agreement, Defendants were required to "scan all incoming Compliant Returns in 'Viewable' status in WMS within 3 business days of arrival" and follow other steps set by Awana, including to "return [the item] to active stock or other disposition as requested by Client."  (*See* Agreement, Exhibit D, p. 24.)  Defendants never satisfied these requirements.

141.     More specifically, returns sat around for days or weeks, and were not properly entered into the system.  In fact, at no point was any return marked in the system as "Back to Stock" or, in Defendants' terminology, "Put Away," which is what was necessary for Awana to know that the returned items were available in inventory.

142.     Furthermore, it was in mid-April 2020 that Defendants made Awana aware that they were processing 14 returns, when the most recent previous return was processed on March 11, indicating that Defendants had not processed returns for weeks, in breach of the Agreement.

143.     Finally, with regard to System Uptime (which required the computer system to be fully operational and accessible 99.5% of the time), Defendants failed to meet this standard in six months, and its performance when it missed the standard, was well off the 99.5% mark (51%, 96%, 76%, 76%, 76%, and 89%).  (*See* Ex. A.)

31

602166545.5

144.     Thus, Defendants breached the Agreement in all six of the contractually specified service categories, and did so in numerous months.

145.     Furthermore, when Defendants did breach the Agreement, they breached the Agreement substantially.

146.     These breaches triggered at least the following contractual damages for which Defendants are liable under the Agreement:

$   6,359.00 for Defendants' breach of its Order Fulfillment Accuracy service obligations
$268,228.00 for Defendants' breach of its On-Time Shipping service obligations
$   6,935.25 for Defendants' breach of its Receiving Timeliness service obligations
$ 10,000.00 for Defendants' breach of its Inventory Accuracy/Annual Inventory
                obligations
$   4,645.00 for Defendants' breach of its Returns Processing service obligations
$   1,045.45 for Defendants' breach of its System Uptime service obligations.
**$297,212.70**

147.     Acknowledging their failure to perform as required under the Agreement in the On-Time Shipping category, Defendants provided $82,282.00 in credits to Awana during the life of the Agreement.

148.     But the $82,282.00 in credits provided did not come close to satisfying the requirements of the Agreement or sufficiently compensating Awana for its losses.

149.     Therefore, Awana seeks damages of at least $214,930.70 caused by Defendants' failure to meet and remediate the expected service-level requirements under the Agreement.

150.     Awana sent notice of this claim for breach of contract to Defendants on May 27, 2020, pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code.  Because Defendants failed to remedy Awana's claim, Awana asks for judgment against Defendants for damages including recovery of Awana's reasonable attorneys fees.

602166545.5

151.     Awana seeks recovery of all actual damages, including all economic and

consequential damages, and reasonable attorneys fees.

COUNT II
BREACH OF CONTRACT—INITIAL INVENTORY VALIDATION NEVER PERFORMED,
ANNUAL PHYSICAL INVENTORY NEVER PERFORMED, AND IMPROPER CHARGES
FOR NONCOMPLIANT INVENTORY INTAKE

152.     Awana incorporates by reference each of the allegations in Paragraphs 1-122

above.

153.     The Agreement constitutes an enforceable contract.

154.     Awana fully performed its obligations under the Agreement.

155.     Under the Agreement, as confirmed by additional communications between the

parties at the outset of the relationship, and as is customary for a logistics provider like

Defendants, Defendants were required to carefully review all items initially received from

Awana and enter into the WMS system exact quantities, by exact product name and SKU/bar

code, of every product received.

156.     This initial "validation" of inventory received applied to all inbound inventory

loads that Defendants received from Awana between January 7, 2019 and January 31, 2019.

157.     Initial inventory was to be validated so that the parties would have a

comprehensive and precise database of the inventory possessed by Defendants so that every

shipment could be charged against a precise and accurate inventory number and so that inventory

could be appropriately replenished based on orders fulfilled and projected needs.

158.     Furthermore, an accurate starting inventory—with the precise location in the

warehouse of each product—was essential because there was no reasonable way for Defendants

to manage the inventory and to efficiently ship product if for every order employees had to walk tens of aisles and look through hundreds of boxes to find the item(s) to be shipped.

159.    Defendants did not perform the precise and accurate initial inventory intake required.

160.    Despite not performing the precise and accurate initial inventory intake required, Defendants nevertheless charged Awana significant fees for various inventory fees.

161.    On invoices from January 12, 2019, through February 16, 2019, Defendants charged Awana a total of $141,422.80 for fees labeled "Receiving Qualified Pallet Fee," "Receiving Qualified Case Fee," "Receiving Qualified Unit Fee," and "Receiving SKU Fee."

162.    The inventory receiving fees charged were improper because Defendants did not perform the precise and accurate initial inventory intake required.

163.    Defendants were also required under the Agreement to perform an annual physical inventory of Awana's inventory, including to confirm the accuracy of the data in the WMS.

164.    Bedgood acknowledged Defendant's obligation to conduct a physical inventory, including by email dated January 9, 2020, and admitted, "The goal of this PI [i.e., physical inventory] is to increase inventory accuracy, which will improve the overall fulfillment process."

165.    Bedgood's email also acknowledged that the physical inventory was Defendants obligation to Awana, with no additional charge to Awana; "Work to perform the PI will result in no charges to you."

166.    Bedgood told Awana that Defendants would conduct the annual physical inventory on January 23-26, 2020.

167.    Defendants never performed the annual physical inventory required.

34

168.    Although Awana had consistent issues with the accuracy of the WMS, it was not until April or May 2020, when Awana began receiving inventory back from Defendants (at the end of the relationship), that Awana discovered that even though Defendants billed for, and withdrew money from Awana's bank account for, what was supposed to be a precise and accurate initial inventory intake, Defendants never actually performed such work.

169.    For example, in April or May 2020 Defendants returned to Awana entire pallets of numerous boxes of varying products that were still in their original shrink-wrapped state as they had been delivered to Defendants by Awana in January 2019.

170.    Thus, Awana has suffered damages of $141,422.80 for the improper inventory processing charges, which that Defendants billed for, and were paid for, but which were never properly performed.

171.    Awana is further entitled to damages for the value of the annual physical inventory that Defendants were required to perform under the Agreement but never performed.

172.    Awana sent notice of this claim for breach of contract to Defendants on May 27, 2020, and August 31, 2020, pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code.  Because Defendants failed to remedy Awana's claim, Awana asks for judgment against Defendants for damages including recovery of Awana's reasonable attorneys fees.

173.    Awana seeks recovery of all actual damages, including all economic and consequential damages, and reasonable attorneys fees.

COUNT III
BREACH OF CONTRACT—ACCOUNT MANAGEMENT FEES
CHARGED BUT NOT EARNED

35

602166545.5

174.     Awana incorporates by reference each of the allegations in Paragraphs 1-122 above.

175.     The Agreement constitutes an enforceable contract.

176.     Awana fully performed its obligations under the Agreement.

177.     Under the Agreement, Defendants were to provide a variety of Account Management services to Awana.  (*See* Agreement, Exhibit B, ¶ 1.)

178.     Defendants were permitted to bill Awana on a monthly basis for Account Management services properly performed.

179.     Defendants billed for, and withdrew money from Awana's bank account for, a variety of Account Management services even though Defendants never properly performed such services.

180.     For example, a central component of proper account management was the quarterly business reviews required by the Agreement.  (*See* Agreement, Exhibit A, ¶ 2(D); *see also* Paragraphs 18-19 above.)  These quarterly business reviews never occurred, despite Awana's several requests for such meetings.

181.     Even worse, due to Defendants' refusal to participate in regular business reviews, the parties were unable to quickly and efficiently address the significant deficiencies in Defendants' performance under the Agreement relating to their account administration, warehouse management, inventory management, fulfillment, and platforms.

182.     Additionally, Awana made repeated requests for various forms of the required Account Management services and Defendants' performance was nearly always nonresponsive, late, inaccurate, and/or incomplete.

602166545.5

183.     Awana has suffered damages in the amount of $16,200 in Account Management fees that it paid on a monthly basis over the life of the Agreement, for which it never received the benefit or value of such services.

184.     Awana sent notice of this claim for breach of contract to Defendants on May 27, 2020, pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code.  Because Defendants failed to remedy Awana's claim, Awana asks for judgment against Defendants for damages including recovery of Awana's reasonable attorneys fees.

185.     Awana seeks recovery of all actual damages, including all economic and consequential damages, and reasonable attorneys fees.

COUNT IV
BREACH OF CONTRACT—DAMAGE AND LOSS OF INVENTORY

186.     Awana incorporates by reference each of the allegations in Paragraphs 1-122 above.

187.     The Agreement constitutes an enforceable contract.

188.     Awana fully performed its obligations under the Agreement.

189.     Under the Agreement (and apart from the Agreement), Defendants had a duty to properly manage, store, move, preserve, and prepare for shipping all of Awana's inventory, Awana having entrusted its inventory to Defendants' care.

190.     During the term of the Agreement, Defendants did not properly manage, store, move, preserve, and prepare for shipping Awana's inventory, which constituted negligence, gross negligence, and recklessness on the part of Defendants.

191.     During the term of the Agreement, Defendants damaged or lost a substantial amount of Awana's inventory.

192.    One body of evidence regarding the amount of lost or damaged inventory is from Defendants' WMS.

193.    Defendants categorized in the WMS as "quarantined" or "in quarantine" products (and quantities of products) that were listed in the WMS as being in Defendants' possession, but which Defendants were not able to physically locate (due to misplacement, damage, or loss).

194.    The data from the WMS confirmed Defendants' gross negligence in their management of Awana's inventory.  Instead of the items in "quarantine" being negligible in number and consistently declining, the amount of Awana's inventory that Defendants had to mark as quarantined was significant in volume and constantly increasing.

195.    Defendants' own WMS data contained the following monthly figures for items in quarantine:

| Quarantine Date | Units |
|---|---|
| 2/26/2019 | 134 |
| 3/22/2019 | 110 |
| 4/26/2019 | 180 |
| 5/23/2019 | 180 |
| 6/17/2020 | 187 |
| 7/1/2019 | - |
| 7/30/2019 | 846 |
| 8/12/2019 | 6,619 |
| 9/4/2019 | 26,595 |
| 10/7/2019 | 35,039 |
| 11/11/2019 | 47,200 |
| 12/31/2019 | 67,824 |
| 1/21/2020 | 59,058 |
| 1/24/2020 | 72,778 |
| 1/27/2020 | 73,489 |
| 2/10/2020 | 78,990 |
| 3/30/2020 | 33,604 |
| 4/28/2020 | 88,173 |

196.    The 88,173 items in quarantine on April 28, 2020, are the number of items in quarantine at the end of the parties' contractual relationship.

197.    When valued solely at the initial purchase cost, these 88,173 items have a value of $241,562.

198.    When valued at retail value, these 88,173 items have a value of $939,916.

199.    Thus, Awana is entitled to recover damages for Defendants' loss of, misplacement of, or damage to these 88,173 items.

200.    Between March 2020 and June 2020, Awana suffered the following additional damages related to Defendants' improper management of Awana's inventory:

  a. Awana had to write off $1,637.00 in damaged inventory it received when Defendants pleaded with Awana to take back certain of its inventory due to Defendants' inability to house the inventory, even though Defendants had an obligation to house the inventory under the Agreement.  Because Defendants failed to properly pack and secure the inventory for shipping, the inventory arrived at Awana's headquarters damaged or destroyed.

  b. Awana expended $2,700.00 in air freight costs to transport replacements for lost inventory.

  c. In May 2020, Awana discovered other damage to inventory totaling $2,303.88.

  d. In May 2020, Awana was forced to spend $675 in additional freight services for outbound shipping of materials that Defendants should have packed on previously outbound trucks.

201.    Awana sent notice of this claim for breach of contract to Defendants on May 27, 2020, and August 31, 2020, pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code.  Because Defendants failed to remedy Awana's claim, Awana asks for judgment against Defendants for damages including recovery of Awana's reasonable attorneys fees.

202.    Awana seeks recovery of all actual damages, including all economic and consequential damages, and reasonable attorneys fees.

## COUNT V
## BREACH OF CONTRACT—BREACHES THAT FORCED AWANA TO INCUR SIGNIFICANT ADDITIONAL EXPENSES

203.    Awana incorporates by reference each of the allegations in Paragraphs 1-122 above.

204.    The Agreement constitutes an enforceable contract.

205.    Awana fully performed its obligations under the Agreement.

206.    From July 2019 through December 2019, Defendants fell significantly behind on fulfilling Awana's customer orders.  Awana had provided Defendants with accurate order forecasts, but Defendants were consistently late in shipping orders and sent inaccurate and poorly packaged products, which resulted in deficient and damaged deliveries and returns.

207.    Defendants' conduct breached the Agreement.

208.    As a proximate cause of Defendants' breaches, Awana incurred significant damages, in the form of out-of-pocket costs, including the following:

    $149,011.00 in expedited customer shipping costs
    $ 77,000.00 in customer care adjustments/credits
    $ 17,676.00 in customer shipping credits
    $  8,711.00 in costs related to Canadian border and freight issues
    $  5,800.00 for additional staffing to cover Defendants' service failures
    $  4,000.00 in expedited inbound freight costs
    $  2,584.00 for pallet labeling costs
    $     800.00 in travel costs
    **$265,582.00**

209.    Awana sent notice of this claim for breach of contract to Defendants on May 27, 2020, pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code.  Because Defendants failed to remedy Awana's claim, Awana asks for judgment against Defendants for damages including recovery of Awana's reasonable attorneys fees.

602166545.5

210.    Awana seeks recovery of all actual damages, including all economic and consequential damages, and reasonable attorneys fees.

COUNT VI
BREACH OF CONTRACT—FUTURE LOSSES
CAUSED BY DEFENDANTS' GROSSLY NEGLIGENT CONDUCT
AND WILLFUL MISCONDUCT

211.    Awana incorporates by reference each of the allegations in Paragraphs 1-122 above.

212.    The Agreement constitutes an enforceable contract.

213.    Awana fully performed its obligations under the Agreement.

214.    Defendants' breaches of the Agreement constituted grossly negligent conduct or willful misconduct.

215.    Awana has continued, and will continue, to suffer damages due to lost business arising out of Defendants' contract-breaching, negligent, and grossly negligent performance under the Agreement and the resulting declines in purchases from Awana's customers.

216.    Pursuant to the Agreement, Awana is entitled to recover "indirect, incidental, consequential, exemplary [and] punitive damages, including, but not limited to, loss of profits" in the event that Defendants' conduct amounts to gross negligence or willful misconduct. (*See* Agreement ¶ 7.5.)

217.    Awana will establish at trial the current and future lost revenue caused by Defendants' breaches, but presently estimates such losses to exceed $2,000,000.

218.    Awana sent notice of this claim for breach of contract to Defendants on May 27, 2020, and August 31, 2020, pursuant to Section 38.001 of the Texas Civil Practices and Remedies Code.  Because Defendants failed to remedy Awana's claim, Awana asks for

41

judgment against Defendants for damages including recovery of Awana's reasonable attorneys

fees.

219.    Awana seeks recovery of all actual damages, including all economic and

consequential damages, and reasonable attorneys fees.

COUNT VII
FRAUD IN THE INDUCEMENT

220.    Awana incorporates by reference each of the allegations in Paragraphs 1-122

above.

221.    In order to induce Awana to enter into the Agreement, Defendants made material,

factual representations to Awana, including those described in Paragraphs 18-19, 21-26 above.

222.    The following representations made by Defendants, among others, were false:

(a)     Awana would be served by "a fully automated [fulfillment] center";

(b)     The facility serving Awana would be "fully robotic";

(c)     The facility serving Awana would "provide flawless accuracy for order

processing";

(d)     Defendants would provide "[f]ace to face quarterly team meetings";

(e)     Defendants would provide "[k]itting/packing to meet [Awana's] exact

specifications, as though [Awana was] standing with [Defendants] packing [Awana's]

orders;

(f)     Defendants would provide "[i]nventory management controls, which will

allow Awana to view orders as they are being processed in real time, and inventory

counts the moment the item is pulled";

42

(g)     Defendants would provide "[s]ame day processing and shipping for all domestic and international orders";

(h)     Defendants would provide their "Fulfillment AutoStore Automation Solution," which would provide "[h]igh efficiency" and "best-in-class goods to person technology";

(i)     Defendants had "the experience and proven track record for scaling fast growing brands (20 per day to 75K per day, we have done it and done it well) because of SuperCenter architecture (all under one roof)";

(j)     Defendants would provide "[s]eamless hand-off from Fulfillment to Transportation, reduc[ing] pick up / line haul and additional hand-offs";

(k)     Defendants would provide "Dedicated Account Management that is on site and on the floor (so [Awana would] have tactical representation on-site)";

(l)     Defendants would provide a "[d]edicated team to ensure Total Consumer Experience and refine out of the box experiences with customized options for pack-outs, kit to stock, and branded boxing"; and

(m)     Defendants would provide "Integrated Enhanced Tracking Solution that [would] extend[] [Awana's] brand, create[] upsell / cross sell opportunities and reach[] across the fulfillment, delivery and returns experiences providing rich data back to [Awana] [to] iterate and improve campaigns."

223.    At the time the representations were made, Defendants knew the representations were false, made such representations without knowledge of their truth, or made such representations in reckless disregard of whether the representations were true.

602166545.5

224.    Defendants made the representations with the intent that Awana would rely on them.

225.    Awana did rely on Defendants' representations.

226.    Awana entered into the Agreement, in reliance on Defendants' representations.

227.    Awana suffered significant harm and damages through its reliance on Defendants' false representations.

228.    Awana seeks the recovery of (a) all proximately caused damages; (b) "out-of-pocket" damages, including the difference between the value of the contractual relationship to Awana had Defendants' representations been true versus the value of the contractual relationship as it was performed; (c) "benefit of the bargain" damages, measured by the difference between the value of the contractual relationship as represented and the value of the contractual relationship Awana actually received, including recovery of the profits that Awana would have earned had the bargain been performed as promised; and (d) punitive damages.

## CONDITIONS PRECEDENT

All conditions precedent to Awana's recovery for the claims asserted herein have occurred or have been performed.

## DEMAND FOR JURY TRIAL

Awana hereby demands trial by jury on all issues so triable.

## PRAYER

Wherefore, Awana prays that Defendants be cited to appear and make answer herein and that the Court enter judgment in favor of Awana and against Defendants on all claims, granting the following relief:

44

602166545.5

(a)      all actual damages, including all economic and consequential damages, and all proximately caused damages;

(b)      "out-of-pocket" damages, including the difference between the value of the contractual relationship to Awana had Defendants' representations been true versus the value of the contractual relationship as it was performed;

(c)      "benefit of the bargain" damages, measured by the difference between the value of the contractual relationship as represented and the value of the contractual relationship Awana actually received, including recovery of the profits that Awana would have earned had the bargain been performed as promised;

(d)      punitive damages;

(e)      pre-judgment and post-judgment interest as provided by law;

(f)      reasonable attorneys fees;

(g)      court costs; and

(h)      all other relief, at law or in equity, that the Court deems appropriate.

Dated:  September 30, 2020                    Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

By: */s/ Tricia W. Macaluso*
Tricia W. Macaluso
Texas Bar No. 24013773
2200 Ross Ave., Suite 3300
Dallas, Texas 75201
214-721-8000
214-721-8100 (fax)
tricia.macaluso@bclplaw.com

- and -

45

Christian Poland (*pro hac vice* admission pending)
161 North Clark Street, Suite 4300
Chicago, Illinois  60601
312-602-5000
312-602-5050 (fax)
christian.poland@bclplaw.com

ATTORNEYS FOR PLAINTIFF,
AWANA CLUBS INTERNATIONAL

46

602166545.5